# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| JIMMY DALE CARVER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 12-cv-614-CVE-TLW |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Jimmy Dale Carver seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from

---

[1] Effective February 14, 2013, pursuant to Fed. R. Civ. P. 25(d)(1), Carolyn W. Colvin, Acting Commissioner of Social Security, is substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act. 42 U.S.C. § 405(g).

anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the

evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a twenty-five year old male, applied for Title XVI benefits on November 13, 2009, alleging a disability onset date of March 1, 2003.[2] (R. 147-49). Plaintiff alleged that he was unable to work due to an injury to the T-10 vertebra in his back and depression. (R. 176). Plaintiff's claims for benefits were denied initially on February 26, 2010, and on reconsideration on May 3, 2010. (R. 69, 70, 71-74, 76-78). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held a hearing on March 24, 2011. (R. 15-17, 42-68). The ALJ issued a decision on April 14, 2011, denying benefits and finding plaintiff not disabled. (R. 18-41). The Appeals Council denied review, and plaintiff appealed. (R. 1-4).

On appeal, plaintiff raises four points of error. (Dkt. # 14). First, plaintiff argues that the ALJ failed to account for plaintiff's mental limitations and obesity in his residual functional capacity findings at step four and in his hypothetical to the vocational expert at step five. Id. Second, plaintiff contends that the ALJ erred when he found that plaintiff's obesity and back injury did not qualify for a listing. Id. Next, plaintiff argues that the ALJ erred in evaluating the

---

[2] Plaintiff was given a protective filing date of October 15, 2009. (R. 147-49). 20 C.F.R. §416.305 provides that a claimant must file an application in order to become eligible for benefits. 20 C.F.R. § 416.330 states that the earliest benefits can be paid is "the month following the month that you first meet all the requirements." Therefore, even though plaintiff alleged a disability onset date of March 1, 2003, the earliest date that plaintiff could have received benefits was November 2009.

Plaintiff also applied for Title II benefits, but plaintiff has no significant work history and was, presumably, not eligible for benefits. (R. 150-51, 152-55).

medical and lay opinions. (Dkt. # 14). Finally, plaintiff contends that the ALJ did not conduct a proper credibility determination. Id.

**The ALJ's Decision**

The ALJ found that plaintiff had not performed any substantial gainful activity since his application date.[3] (R. 24). The ALJ also found that plaintiff had the following severe impairments: "back pain in the thoracic and lumbar spine; obesity; mood disorder, not otherwise specified; history of substance abuse, in remission; personality disorder, not otherwise specified (antisocial features), and reduced visual acuity in the left eye (which may be more than *de minimus* [sic])." (R. 24-25). With respect to plaintiff's vision, the ALJ noted that although the consultative examining physician had diagnosed plaintiff as blind in the left eye, the exam results actually showed that plaintiff's vision in his left eye was 20/200 uncorrected. (R. 25). Plaintiff was not wearing glasses at the time of the eye exam, but he told the consultative psychological examiner that he wore glasses and was able to drive with "a restriction on the left outside rearview mirror on his driver's license." Id. Because plaintiff had no other records of treatment, the ALJ determined that plaintiff's vision problems were not a severe impairment because they caused "no more than minimal limitation in the ability to perform basic work activities." Id.

The ALJ then determined that plaintiff did not meet or medically equal a listing. (R. 25-26). The ALJ considered Listing 1.04 (disorders of the spine) and found that plaintiff did not have the required limitations of "motor loss with accompanying sensory or reflex loss" (for Listing 1.04.A) or "spinal arachnoiditis" (for Listing 1.04.B). (R. 26). Further, plaintiff was able to "ambulate effectively," ruling out Listing 1.04.C. Id. The ALJ found that plaintiff did not qualify for these listings, even when considering plaintiff's obesity. Id.

---

[3] Plaintiff's part time work in November and December 2010 did not qualify as substantial gainful activity. (R. 24).

Plaintiff's mental impairments also did not meet or medically equal Listings 12.04, 12.06, 12.08, or 12.09. (R. 26). Applying the "paragraph B" criteria, the ALJ found that plaintiff had mild restrictions in activities of daily living; moderate limitations in social functioning; moderate limitations in concentration, persistent, or pace; and no episodes of decompensation. (R. 26-27). In reaching these findings, the ALJ relied on plaintiff's statements, the statements of his fiancée, and the findings of the consultative medical examiner who conducted a mental status evaluation. Id. The ALJ noted that his review of the "paragraph B" criteria was not intended as a substitute for a residual functional capacity analysis. (R. 28).

The ALJ then reviewed plaintiff's testimony and the medical evidence. (R. 30-35). Plaintiff testified that he received his GED in 2003 and received training in "drafting and electrical technology" in prison.[4] (R. 30). Plaintiff lived with his fiancée and drove a car locally on a daily basis. Id.

Plaintiff testified that he had issues with his right knee that caused balance problems once a week. Id. Plaintiff experienced back pain when he lifted more than fifteen pounds, although his doctor had restricted him to twenty pounds. Id. Plaintiff could walk thirty minutes and sit thirty to forty-five minutes before experiencing pain. Id. Plaintiff was not receiving therapeutic or medical treatment for his mental health issues because he could not afford it. Id. Plaintiff did attend group therapy with a sex offender counselor every two weeks as part of his probation. Id.

Plaintiff underwent a consultative physical examination in January 2010. (R. 30-31). Plaintiff complained of back pain, which began in 1999 following a high school football injury. (R. 31). The examining physician found that plaintiff had the ability to walk normally. Id. Plaintiff had a full range of motion, but he had tenderness "in the dorsal and lumbar midline,"

---

[4] Plaintiff was incarcerated for aggravated sexual abuse on a child from 2003 to March 2009. (R. 30). Plaintiff was still "on probation" at the time of the hearing, which involved monthly meetings with his probation officer and drug testing as ordered. Id.

and "pain on range of motion testing of the lumbosacral spine." (R. 31). Plaintiff's "deep tendon reflexes were 2/4 bilaterally." The examining physician diagnosed plaintiff with lower dorsal pain, history of depression, and blindness in the left eye. Id. The ALJ noted that the physician's diagnosis of plaintiff's vision was inconsistent with his examination findings. Id.

Following the consultative examination, plaintiff received treatment at Northeastern Tribal Health. Id. Plaintiff complained of back pain. Id. Plaintiff had "point tenderness over the spinous process of T-10" but no other issues upon examination. Id. The physician took x-rays, which showed "mild facet arthrosis bilaterally at the L5 level, Schmorl nodes at L4-L5 and L5-S1, and a severe age indeterminate compression deformity at the T10 level." Id. The physician prescribed Tramadol and ibuprofen for pain. Id. When plaintiff returned for follow-up treatment in August 2010, plaintiff complained that the pain relievers were not effective. Id. The physician's assistant who examined plaintiff "stated that he had nothing to offer the claimant for his low back pain" and discontinued the prescriptions. Id.

Plaintiff had no history of treatment for his mood and personality disorders, and the ALJ noted that plaintiff had reported that he could not afford treatment. (R. 32). Plaintiff did receive a consultative psychological examination in January 2010. Id. Plaintiff reported that he had no history of hospitalization, but he received limited counseling and psychiatric treatment while in federal prison. Id. Plaintiff currently attended outpatient group sex offender treatment. Id. Plaintiff reported feelings of depression, anxiety, and "vague hallucinatory experiences." Id.

The examining psychologist found that plaintiff was cooperative but had "a withdrawn manner and an overall blunted affect." Id. The psychologist estimated that plaintiff fell within the borderline to low average range of functioning with learning disabilities. Id. Plaintiff was vague in his descriptions of his hallucinations, and the psychologist suspected that plaintiff might be

minimizing his symptoms of behavioral disorder and substance abuse. (R. 32). He diagnosed plaintiff with mood disorder, not otherwise specified; history of methamphetamine, opioid, and cannabis dependence, full sustained remission; and personality disorder, not otherwise specified (antisocial features). (R. 33). He also recommended ruling out diagnoses of psychotic disorder, not otherwise specified; learning disorder, not otherwise specified; and borderline intellectual functioning. Id. The psychologist assigned plaintiff a GAF score of 45. Id.

The ALJ accepted the definitive diagnoses but rejected the provisional diagnoses. Id. The ALJ relied on the psychologist's findings that plaintiff's complaints were vague and unclear. Id. The ALJ also noted that plaintiff's signs of learning disorder and borderline intellectual functioning conflicted with the fact that plaintiff had completed his GED. (R. 33).

The ALJ then considered plaintiff's credibility and found that plaintiff was only partially credible. (R. 34). The ALJ rejected plaintiff's claims of limited activities of daily living. Id. The ALJ also relied on the lack of treatment and medication in plaintiff's records, as well as the fact that plaintiff's treatment, limited as it was, was both routine and conservative. Id. Plaintiff's claims of an inability to afford treatment were not borne out by the record, which contained no evidence that plaintiff had sought and been denied treatment. Id. The ALJ considered plaintiff's medical findings, which showed some abnormalities in plaintiff's spine but no proof of severe pain, either in the testing or in the opinions of plaintiff's examining physicians. Id. Finally, the ALJ relied on the consultative psychological examiner's report, which found that plaintiff could handle simple and moderately complex tasks; limited interaction with the public, supervisors, and co-workers; and simple work environments. (R. 34-35). The ALJ also emphasized that the psychologist also found plaintiff to be only "partially reliable." (R. 35).

Based on this evidence, the ALJ concluded that plaintiff could perform simple light and sedentary work under routine supervision with the following restrictions: "unable to climb ropes, ladders, and scaffolds;" "unable to work in environments where he would be exposed to unprotected heights and dangerous moving machinery parts;" and no more than occasional interaction with the public. (R. 29). The ALJ noted that plaintiff would have symptoms of "moderate intermittent pain and fatigue, depression, and allied disorders, all variously described, that are of sufficient severity so as to be noticeable to him at all times, but nevertheless [he] is able to remain attentive and responsive in a work-setting. . . ." Id. The ALJ specifically considered plaintiff's obesity in limiting him to light and sedentary work. (R. 31-32).

Plaintiff had no history of past relevant work. (R. 36). However, the ALJ found, based on the testimony of a vocational expert, that plaintiff could perform other work. (R. 37-38). In the category of light work, plaintiff could perform work as an "electronics assembler" or "housekeeper." Id. In the category of sedentary work, plaintiff could perform work as a "semi-conductor assembler" or "clerical mailer." (R. 38). Accordingly, the ALJ found that plaintiff was not disabled. Id.

**Plaintiff's Medical Records**

Plaintiff's medical records demonstrate that he sought treatment for back pain only after he applied for benefits, between March 2010 and August 2010. (R. 257-305). Plaintiff saw a doctor on March 29, 2010, with complaints of back pain stemming from a high school football injury he sustained in 1999. (R. 258-66). Examination revealed diminished Achilles reflex and "Point tenderness over the spinous process of T-10." (R. 260). Plaintiff's depression screening was negative. (R. 263). X-rays taken in March 2010 showed "Severe age indeterminate compression deformity at T10." (R. 266). The radiologist also noted "Mild facet arthrosis . . .

bilaterally at L5 level" and "Schmorl nodes at L4-L5 as well as L5-S1." (R. 266). Plaintiff was given prescriptions for ibuprofen and Tramadol and encouraged to be active. (R. 260).

Plaintiff attended follow-up appointments for medication refills in April, May, June, and July 2010. (R. 257, 272-305). In August 2010, plaintiff complained that the pain medications were not effective. (R. 270-71). The physician's assistant who saw plaintiff that day noted that he had "nothing to offer" for plaintiff's lower back pain and discontinued the pain medication. (R. 271). He further noted that plaintiff "may try to see someone at OU." Id. He diagnosed plaintiff with lumbago and malaise. Id.

Other than those few months of pain management treatment, plaintiff's medical records consist solely of agency reviews and consultative examinations.

**Consultative Psychological Examination**

Plaintiff underwent a consultative psychological evaluation in January 2010. (R. 222-229). Plaintiff reported that he had seen a psychiatrist and received limited counseling while he was in federal prison for aggravated sexual abuse on a child under twelve years of age. (R. 224). He claimed that he took psychiatric medication in prison to "help me with sleep." Id. The consultative examining psychologist noted that plaintiff "said he refuses to go to a doctor to see if he needs medications at this time." Id.

The psychologist noted that plaintiff was cooperative "but had a withdrawn manner and an overall blunted affect." Id. His attention was normal, and "[h]is flow of thought represented likely lowered cognitive functioning." Id. Plaintiff stated that he had lost vision in his left eye, but he reported "primary concerns of depression, anxiety and vague hallucinatory experiences, in addition to his reported back injury." Id.

9

Test results showed that plaintiff's attention and memory were average, but he had poor vocabulary skills and poor results with respect to general knowledge. (R. 225). Plaintiff's self-reported symptoms, however, were not always clear. Plaintiff reported experiencing a feeling that "somebody is calling him from his sleep" twice a week since age thirteen. (R. 225-26). He had never previously reported this symptom and "did not report more clear indications of a psychotic disorder." (R. 226). Plaintiff did report clear symptoms of anxiety, anger, and substance abuse. Id.

The consultative examining psychologist found that plaintiff was only "a partially reliable informant." She diagnosed plaintiff with Mood Disorder, NOS; Personality Disorder, NOS (Antisocial Features), and a history of substance abuse in remission per plaintiff's report. (R. 227-28). The psychologist also made several provisional diagnoses, including Psychotic Disorder, NOS; Learning Disorder, NOS; and Borderline Intellectual Functioning. Id. Finally, the psychologist opined that plaintiff maintained the ability "to understand and remember simple instructions;" "concentrate and persist on moderately complex tasks;" have limited interaction with the public, supervisors, and co-workers; and "adapt to a simple work environment." (R. 227).

**Consultative Physical Examination**

Plaintiff also underwent a consultative physical examination in January 2010. (R. 230-36). Plaintiff's primary complaint was back pain following a football injury in 1999. (R. 230). Plaintiff also complained of poor vision in his left eye.[5] Id. Upon examination, the physician found that plaintiff had a normal gait and "good full range of motion of the spine." Id. The

---

[5] Plaintiff told the consultative examining physician that he could not remember the cause of his vision problems (R. 230), but he told the consultative examining psychologist that he lost vision in his left eye and was able to see only colors and shapes as the result of a dog bite at age five. (R. 224).

physician did note that plaintiff had pain in his lumbosacral spine with bending, flexion, and extension and diminished reflexes; however, his strength was normal, and he had no muscle spasms. (R. 234).

The consultative examining physician determined that plaintiff had 20/20 vision in his right eye and 20/200 vision in his left eye, uncorrected. (R. 230). Plaintiff was not wearing glasses. Id. He diagnosed plaintiff with low back pain, a history of depression without medication, and blindness in the left eye. Id. Still, the physician opined that plaintiff could read, write, and perform activities of daily living. Id.

**The ALJ Hearing**

The ALJ held a hearing on March 24, 2011. (R. 42-68). Plaintiff testified that he received his GED in 2003 and took drafting and electrical technology classes in federal prison in 2006 and 2007. (R. 49). He was able to drive locally but had a left outside rearview mirror restriction listed on his driver's license due to the loss of vision in his left eye. (R. 50).

Plaintiff's main complaint was back pain. (R. 53-59). He testified that he had worked one day a week in November and December 2010 making salads but could not do the work due to back pain. (R. 54). He quit before he could be fired. Id. Before he went to prison in 2003, he had worked as a lineman in a factory and in sanitation at another factory. (R. 55-56). Plaintiff stated that he helped with chores and yard work, but his fiancée or father-in-law always had to complete the work. (R. 57). He could bathe himself but needed reminders. (R. 56). He spent most of the day watching television, playing video games, and reading. (R. 58). His doctor had told him that he could lift up to twenty pounds, but he experienced pain lifting more than fifteen. (R. 59). He could sit without pain for thirty to forty-five minutes and walk for thirty minutes. Id. Plaintiff stated that his doctor told him to walk as little as possible. Id.

11

With respect to his mental health, plaintiff stated that he could not afford treatment or medication and was currently receiving neither. (R. 60). He was attending group therapy for sex offenders with a social worker every two weeks and had begun that treatment following his release from prison. (R. 60-61).

In response to the hypothetical ultimately adopted by the ALJ, the vocational expert testified that plaintiff could perform light work as an electronics assembler or housekeeper and sedentary work as a semiconductor assembler or clerical mailer. (R. 63-64). The ALJ then added additional restrictions to his hypothetical, including a sit/stand option and close supervision. (R. 65-67). The vocational expert testified that those additional restrictions would preclude plaintiff from working. Id. Plaintiff offered no additional testimony, and his counsel asked no questions of the vocational expert. (R. 67).

## ANALYSIS

Plaintiff argues that the ALJ committed multiple errors. Plaintiff contends that his back pain, combined with his obesity, qualifies as a listed impairment. (Dkt. # 14). Plaintiff also argues that the ALJ should have included additional mental limitations and limitations from obesity in the residual functional capacity assessment and in the hypothetical to the vocational expert. Id. Third, plaintiff contends that the ALJ improperly considered the medical and lay opinions regarding plaintiff's level of functioning. Id. Finally, plaintiff argues that the ALJ did not conduct a proper credibility determination. Id.

### Step Three – Listing for Spinal Disorders

Plaintiff argues that his complaints of pain, combined with the x-rays showing "a deformed T10 vertebra" and "facet arthritis" constitute "two separate back ailments" that, in combination with plaintiff's obesity, would have prompted a "reasonable ALJ" to find that

plaintiff met a listing. (Dkt. # 14). Plaintiff criticizes the ALJ's treatment of plaintiff's obesity and argues that the ALJ's accommodations of light and sedentary work failed to meet the requirements for assessing obesity under SSR 02-1p. Id. The Commissioner argues that plaintiff failed to meet his burden of proof at step three to show that he met a listing for spinal disorders. (Dkt. # 15). Alternatively, the Commissioner argues that the objective medical evidence supports the ALJ's findings and that the ALJ specifically considered plaintiff's obesity in evaluating plaintiff's claims of back pain at step three. Id.

In assessing plaintiff's back pain, the ALJ considered Listing 1.04 (disorders of the spine) and cited its requirements. (R. 25-26). He found that neither plaintiff's medical records nor plaintiff's symptoms met the criteria for the listing. Id. Specifically, the ALJ found that plaintiff did not have the required limitations of "motor loss with accompanying sensory or reflex loss" (for Listing 1.04.A) or "spinal arachnoiditis" (for Listing 1.04.B). (R. 26). Further, plaintiff was able to "ambulate effectively," ruling out Listing 1.04.C. Id. The undersigned's review of the medical records confirms the ALJ's findings. The x-rays showed a deformity in plaintiff's T-10 and facet arthrosis, but no spinal arachnoiditis. (R. 266). Plaintiff's physical examination also showed no motor loss or difficulty walking. (R. 230-36).

As to plaintiff's obesity, "[a]n ALJ must consider 'the combined effects of obesity with other impairments' and 'evaluate each case based on the information in the case record.'" Arles v. Astrue, 438 Fed.Appx. 735, 740 (10th Cir. 2011) (quoting SSR 02-1p) (unpublished).[6] The ALJ considered plaintiff's obesity and found that it did not combine with plaintiff's other impairments to meet a listing. (R. 26). In addition, the ALJ found no "medical evidence or opinion" that rendered plaintiff's obesity equivalent to a listing. Id. After reviewing the medical

---

[6] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

records, the undersigned agrees. Plaintiff's medical records do not address obesity as an issue. In fact, his diet was addressed only after he was diagnosed with hyperlipidemia. (R. 270). Ultimately, the ALJ determined that plaintiff's obesity could be accommodated by limiting plaintiff to light and sedentary work. (R. 31-32). The ALJ's decision demonstrates that the ALJ followed the dictates of SSR 02-1p and correctly considered plaintiff's obesity. Moreover, plaintiff's argument, if accepted, would require the Court to re-weigh the evidence, something it cannot do. See generally Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (holding that the Court will not "substitute [its] judgment for that of the agency."); Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007) (holding that the Court will examine the entire record but will not re-weigh the evidence).

Thus, the undersigned recommends that the ALJ's listing decision be affirmed.

**Residual Functional Capacity and Hypothetical to the Vocational Expert**

Plaintiff contends that the ALJ failed to adopt certain mental limitations from the agency experts in his residual functional capacity findings and in his hypothetical to the vocational expert notwithstanding the fact that he gave great weight to those opinions. (Dkt. # 14). Plaintiff also alleges that the ALJ should have incorporated his findings regarding plaintiff's mental limitations at step two into his findings at steps four and five. Id. Finally, plaintiff argues that the ALJ failed to address plaintiff's obesity in his residual functional capacity findings and in the hypothetical to the vocational expert. Id. Plaintiff frames this argument as a "step five" argument, although he does reference the ALJ's residual functional capacity findings as well. Id.

The Commissioner argues that plaintiff misapplies the law in these arguments. (Dkt. # 15). First, the Commissioner contends that the agency physician's findings regarding limitations were "summary conclusions," not intended to be controlling or conclusive findings from the

physician. (Dkt. # 15). Next, the Commissioner argues that plaintiff's argument about the ALJ's "paragraph B" findings is misplaced. Id. Finally, the Commissioner argues that the ALJ is not required to list the impairments, such as obesity, in his hypotheticals to the vocational expert. Id. The Commissioner contends that the ALJ cited the proper restrictions and gave due consideration to plaintiff's obesity. Id.

As an initial matter, the undersigned notes that plaintiff's argument is not a step five argument but a step four argument, in which plaintiff essentially challenges the ALJ's residual functional capacity findings. This distinction is significant because a claimant bears the burden of proof at step four, while the Commissioner bears the burden of proof at step five. See Langley v. Barnhart, 373 F.3d 1116, 1118 (10th Cir. 2004).

The ALJ gave "great weight" to the opinions of the agency physicians with respect to plaintiff's mental limitations, stating that he believed they were "consistent with the residual functional capacity" findings. (R. 36). The ALJ did not specifically reference the mental limitations that plaintiff argues the ALJ ignored – namely, plaintiff's ability to accept instruction and criticism, cited in the agency physician's Psychiatric Review Technique form. (Dkt. # 14; R. 36, 238). However, the ALJ did limit plaintiff to simple instructions. (R. 29). The undersigned finds that this limitation is consistent with the ALJ's findings and the ALJ's decision to give great weight to the opinions of the agency physicians, who concluded that plaintiff could perform simple tasks and relate to supervisors on a superficial basis. (R. 36, 238-39).

Next, the undersigned agrees with the Commissioner that plaintiff's reliance on the ALJ's step two findings is misplaced. Plaintiff argues that at step four, the ALJ should have addressed the moderate limitations on social functioning and concentration, persistence, or pace. Id. As SSR 96-8p establishes and as the ALJ noted in his decision, however, "the limitations identified

15

in the 'paragraph B' and 'paragraph C' criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p; (R. 28). The ALJ was not required to address those findings in his residual functional capacity assessment. Nonetheless, the undersigned finds that the ALJ did take those limitations into account at step four. The ALJ limited plaintiff to simple tasks and restricted his interactions with the public. (R. 29). These limitations are consistent with the ALJ's findings regarding the severity of plaintiff's limitations at step two.

Finally, as previously stated, the ALJ properly addressed plaintiff's obesity. Plaintiff argues that the ALJ should have mentioned plaintiff's obesity in his hypotheticals to the ALJ. (Dkt. # 14). The Tenth Circuit Court of Appeals has addressed this issue in a similar case. In Jimison ex rel. Sims v. Colvin, 513 Fed.Appx. 789 (10th Cir. 2013) (unpublished), the Tenth Circuit affirmed an ALJ's treatment of plaintiff's obesity, finding "there is no record indication of any functional limitations from [the plaintiff's] obesity or of any impairments possibly caused or exacerbated by her obesity that are inconsistent with the [ALJ's] RFC for a full range of sedentary work with a sit/stand option." Id. at 798. Here, the ALJ made accommodations for plaintiff's obesity by limiting him to light or sedentary work, even though no medical evidence supported a finding that plaintiff's obesity limited his ability to function. (R. 31-32).

**Step Five and Plaintiff's Vision**

As part of his obesity argument, plaintiff also contends that the ALJ erred in finding that plaintiff could perform other work. The undersigned has recommended rejecting plaintiff's arguments about his inability to perform light work due to obesity. See supra at 13-14. Plaintiff argues that the sedentary work proposed in the ALJ's decision is improper due to the limitations

16

on plaintiff's vision. Again, this argument, although framed as a step five argument, is a challenge to the ALJ's residual functional capacity findings.

A close reading of the ALJ's decision demonstrates that the ALJ found that plaintiff's vision impairment was not a severe impairment. (R. 25). The ALJ rejected the consultative examining physician's diagnosis that plaintiff was blind in his left eye because the physician's own examination findings contradicted that diagnosis. Id. Further, plaintiff testified that he was able to read with glasses and was able to drive without difficulty. Id. Plaintiff had not sought treatment for vision problems. Id. The ALJ concluded that plaintiff's vision impairment would "cause no more than minimal limitation in the ability to perform basic work activities." Id. Plaintiff has not challenged this finding. Instead, he argues that the ALJ should have included limitations at step five.

The ALJ is required to consider all limitations, including those that are not severe, in making his findings regarding a claimant's residual functional capacity. See 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2). The Tenth Circuit has held that when an ALJ finds that an impairment is non-severe at step two, he must still include some discussion at step four in order to satisfy the courts that he has properly considered any limitations arising from that impairment. See Wells v. Colvin, 727 F.3d 1061, 1064-65 (10th Cir. 2013). Here, the ALJ included a detailed discussion of his findings regarding plaintiff's vision at step two and then re-iterated his position at step four. (R. 25, 31). The undersigned finds that this discussion is sufficient to satisfy the requirements of Wells and that the ALJ's decision not to include any limitations regarding plaintiff's vision at step four is supported by substantial evidence. Accordingly, the undersigned recommends a finding of no error on this issue.

**Medical Source and Lay Opinions**

Plaintiff contends that the ALJ ignored the GAF score given by the consultative examining psychologist and plaintiff's fiancée's third-party function report. (Dkt. # 14). As a result, plaintiff argues that the ALJ failed to develop the record. Id.

**GAF Scores**

The Commissioner argues that the ALJ clearly gave little weight to the GAF score even though he was not even required to consider it. (Dkt. # 15). With respect to the fiancée's report, the Commissioner contends that it is not a medical source opinion and is not subject to the same evaluation process as a medical source opinion. Id.

GAF scores may be helpful in formulating residual functional capacity findings, but they are not essential components of accurate findings. See Zachary v. Barnhart, 94 Fed.Appx. 817, 819 (10th Cir. 2004) (unpublished) (citing Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). The Tenth Circuit has held that GAF scores are particularly unhelpful when the medical source who assigns the score fails to explain the reasons for the rating and do not necessarily need to be discussed. See id.

In this case, the consultative examining psychologist did not explain her reason for assigning plaintiff the GAF score of 45. The ALJ acknowledged the GAF score but did not discuss it in detail. However, the ALJ clearly considered the psychologist's opinion and gave specific reasons for rejecting some findings and accepting others. (R. 32-33). Additionally, "[t]he record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence." Clifton v. Chater, 79 F.3d 1007, 1009-10 (10th Cir. 1996). In light of the Tenth Circuit's guidance in Zachary, the undersigned recommends a finding that

18

the ALJ clearly considered the GAF score but was not required to consider it in order to form accurate residual functional capacity findings.

**Third Party Function Report**

With respect to the third party function report, plaintiff argues that the ALJ should have assessed that opinion using a modified version of the factors listed in 20 C.F.R. § 416.927 regarding medical source opinions. (Dkt. # 14). Plaintiff cites Hopper v. Astrue, 2011 WL 1311712 (E.D.Okla. March 31, 2011) in support of his argument but provides no further explanation of its application here.

In Hopper, the magistrate judge found that the ALJ applied the wrong legal standard to the consideration of six third party function reports as part of his credibility assessment. See id. at *2-6. The ALJ determined that the third party function reports were not credible because they were "for the most part, dependent upon the subjective complaints of a claimant," whom the ALJ had determined was not credible. Id. at *4. The magistrate judge reversed the case and remanded it for the ALJ to review the third party function reports under the standard set forth in SSR 06-03p. See id. at *5-6.

SSR 06-03p states that the ALJ must consider evidence from "'non-medical sources' who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors." That Ruling also acknowledges, however, that there is a distinction between what an ALJ must consider and what an ALJ must explain. See SSR 06-03p. Specifically, the Ruling states that for those "other source" opinions that do not require discussion, the ALJ "generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when

such opinions may have an effect on the outcome of the case." Id. Nothing in Hopper contradicts SSR 06-03p, which only requires that subsequent reviewers be able "to follow" the ALJ's reasoning and then only if the third party opinions will have "an effect on the outcome of the case." Id. Therefore, the finding in Hopper, at most, indicates that the magistrate judge believed the third party function reports could have an effect on the outcome of the case, and the ALJ's decision to reject the third party function reports based solely on a finding that the plaintiff was not credible was an insufficient reason to reject the reports on their merits.

Here, the ALJ cited to the fiancée's report, which stated that plaintiff could follow written and spoken instructions and complete tasks, but the ALJ did not expressly weigh that opinion or assess the fiancée's credibility. (R. 27). Nonetheless, the ALJ obviously considered the fiancée's report because he discussed those portions of it that were consistent with his residual functional capacity findings. Id. Since the ALJ clearly considered the report, the question is whether or not the ALJ's reasoning, with respect to those portions of the report that he did not discuss, can be followed and whether or not the report could have an effect on the outcome of this case.

The fiancée's report indicates that plaintiff experienced back pain, needed glasses, and had issues with concentration. (R. 183-90). Although the ALJ did not reference these portions of the report, the ALJ's decision makes clear that he was aware of them, either through plaintiff's testimony or the medical reports. In fact, the ALJ discussed plaintiff's pain, vision, and concentration in great detail, and the fiancée's report does not contain any information or identify any specific issue that the ALJ did not consider. (R. 25-27, 30-31, 33-36). Thus, there was no error, both because consideration of the report could have no impact on the outcome of this case (it could add nothing new to the ALJ's analysis) and because the ALJ's reasoning with regard to the issues raised in the fiancée's report is clear.

Moreover, in light of SSR 06-03p, the reasoning of <u>Clifton</u>, discussed in the previous section, further supports this conclusion. The court's opinion, in <u>Clifton</u>, states that

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. <u>Vincent ex rel. Vincent v. Heckler</u>, 739 F.2d 1393, 1394-95 (9th Cir. 1984). Rather, in addition to discussing the evidence supporting his decision, the ALJ must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects. <u>Id.</u>

<u>Clifton</u>, 79 F.3d at 1009-10. Therefore, <u>Clifton</u> reiterates, in a different context, the language in 06-03p, that the ALJ need only discuss evidence that he or she rejects if that evidence is significantly probative. Here, the fiancée's lay opinion, as set forth in the third party function report, contains no evidence that the ALJ did not already consider, which makes the report cumulative and not significantly probative. It did not require additional discussion. For these reasons, the undersigned recommends a finding that the ALJ's discussion of the fiancée's third party function report is sufficient.

Finally, plaintiff argues that the ALJ should have conducted additional investigation or further developed the record. But plaintiff's counsel did not indicate at the hearing that additional investigation was necessary or that the record needed further development. In addition, he did not call the fiancée to testify as a witness at the hearing. An "ALJ should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1167 (10th Cir. 1997). If the fiancée's opinion was of great importance, plaintiff's counsel could have called the fiancée as a witness or brought the third party function report to the ALJ's attention. As discussed *supra*, the ALJ clearly was aware of the fiancée's opinion as he specifically cited certain aspects of it and addressed the substance of it in his decision. Accordingly, the

undersigned recommends a finding of no error on this issue because the ALJ clearly considered the entire record in reaching his decision and was not required to develop the record further.

**Credibility**

Plaintiff argues that the ALJ failed to perform a proper credibility assessment. (Dkt. # 14). Plaintiff argues that although the ALJ noted which statements he found credible, he failed to specify which statements he found incredible. Id. Plaintiff also argues that the ALJ failed to specifically discuss discrepancies in the record and improperly relied on plaintiff's activities of daily living, conservative treatment, and financial inability. Id.

The Commissioner argues that the ALJ properly reviewed plaintiff's statements and properly relied on plaintiff's activities of daily living to support his finding that plaintiff was not entirely credible. (Dkt. # 15). The Commissioner also contends that failure to seek treatment available to him is a proper credibility consideration. Id.

This Court is not to disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the

consistency or compatibility of nonmedical testimony with objective medical evidence." <u>Kepler v. Chater</u>, 68 F.3d 387, 391 (10th Cir. 1995).

The ALJ discussed the medical evidence at length in his residual functional capacity analysis and re-emphasized certain portions of that evidence that supported his credibility assessment. (R. 34). For example, the ALJ stated that despite plaintiff's claims of disabling back pain, plaintiff did not seek treatment until after he applied for disability benefits. <u>Id.</u> Moreover, the ALJ noted that the treating physician's assistant discontinued plaintiff's pain medications shortly after plaintiff sought treatment and ordered a one-year follow-up visit. <u>Id.</u> The ALJ also cited to the conservative nature of the treatment, the lack of any clinical evidence to support plaintiff's claims of disabling pain, and plaintiff's own testimony that he took no medications for his back pain. <u>Id.</u> With respect to plaintiff's mental impairments, the ALJ again cited specific examples of plaintiff's lack of treatment. <u>Id.</u> This analysis is sufficient to support the ALJ's determination that plaintiff was not entirely credible.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision at step five in this case be **AFFIRMED**.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by February 28, 2014 .

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has

properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. <u>See</u> <u>also</u> 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." <u>United States v. One Parcel of Real Property</u>, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting <u>Moore v. United States</u>, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 14th day of February, 2014.

_____
T. Lane Wilson
United States Magistrate Judge